# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# ORANGEBURG DIVISION

| | |
|---|---|
| United States of America, ) | |
| ) | Criminal Action No.: 5:12-cr-00810-JMC-1 |
| ) | |
| v. ) | |
| ) | |
| ) | **ORDER AND OPINION** |
| Gerald Decosta Whaley, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

Before the court for review is Defendant Gerald Decosta Whaley's 28 U.S.C. § 2255 Motion to Vacate, filed on April 13, 2015. (ECF No. 252.) On November 13, 2017, the court granted the United States of America's (the "Government") Motion for Summary Judgment (ECF No. 268) and denied Whaley's Motion to Vacate. (ECF No. 284 at 2.) On August 6, 2018, the United States Court of Appeals for the Fourth Circuit vacated in part the court's November 13, 2017 Order and remanded the case for further proceedings. (ECF No. 292 at 3–4.) For the reasons set forth below, the court **GRANTS** Whaley's Motion to Vacate and **VACATES** its original May 30, 2014 Judgment (ECF No. 244).

## I. FACTUAL AND PROCEDURAL BACKGROUND

On January 14, 2014, Whaley pled guilty to knowingly possessing firearms in furtherance of drug trafficking crimes. (ECF No. 66 at 4; ECF No. 209 at 1–2; ECF No. 213 at 1.) On April 30, 2014, the court sentenced Whaley to two hundred sixty-two (262) months of imprisonment and five (5) years of supervised release. (ECF No. 244.) On April 13, 2015, Whaley filed a Motion to Vacate under 28 U.S.C. § 2255. (ECF No. 252.) Whaley's Motion presented three ineffective assistance of counsel claims: (1) "fail[ure] to file a direct appeal after being informed by [Whaley] to do so" (ECF No. 252-1 at 3); (2) "fail[ure] to file a motion to suppress evidence" (*id.* at 6); and

1

(3) "fail[ure] [at sentencing] to challenge and be objective to [Whaley]'s prior convictions" (*id.* at 8).

On November 25, 2015, the Government filed a Response in Opposition to Whaley's Motion, an affidavit by Whaley's trial counsel, Jeffrey P. Bloom, and a Motion for Summary Judgment. (ECF Nos. 267; 267-1; 268.) In Bloom's affidavit, he asserted that "[i]n preparing this Affidavit, and made pursuant to the [c]ourt's order, I reviewed some of my notes, my time-sheets, my computer case file, and some of my actual paper files in this case."[1] (ECF No. 267-1 at 1 ¶ 3.) According to Bloom, on January 14, 2014, while at the Lexington County Detention Center ("LCDC"), he "specifically reviewed with Mr. Whaley the final written plea agreement . . . . which would have included the specific waiver of appeal." (*Id.* at 3 ¶ 8.) After Whaley was sentenced, Bloom avers that "on April 30, 2014, [he] met with Mr. Whaley and reviewed his sentence and related matters, and this included a discussion of the waiver of appeal as contained in a specific provision of the written plea agreement." (*Id.* at 3 ¶ 9.) Bloom further asserts that he "saw no meritorious issue from which to appeal from concerning sentencing, especially since Mr. Whaley was sentenced at the low end of the advisory guideline range, and that the [c]ourt did not adopt the Government's argument for an enhanced sentence." (*Id.* at 3 ¶ 10.) Bloom's affidavit did not address Whaley's claim that he "informed" Bloom to file an appeal. (ECF No. 252-1 at 5.)

On January 13, 2016, in response to the Government's Motion, Whaley submitted his own affidavit. (ECF No. 271-1.) Whaley averred that he "informed [Bloom] at [s]entencing that [he] wished to file [a] direct appeal. Although counsel informed [him] that it would be done, [Bloom] never fulfilled his obligation." (*Id.* at 2 ¶ 2.) Prior to submission of his affidavit, on June 10, 2015,

---

[1] Bloom further explained that he "ha[d] not specifically reviewed [his] entire case file – which comprises a large box of materials – but would be glad to do so if the need arises to refresh my recollection about any particular issue, matter, or inquiry." (ECF No. 267-1 at 1 ¶ 3.)

2

Whaley requested an evidentiary hearing on his Motion to Vacate. (ECF No. 261 at 1.) On September 8, 2016, the court denied Whaley's request. (ECF No. 277.)

On November 13, 2017, the court granted the Government's Motion for Summary Judgment and denied Whaley's Motion to Vacate. (ECF No. 284 at 2.) As to Whaley's claim Bloom was ineffective for failing to file an appeal after being directed to do so, the court found

> [Whaley] does not provide the court with any date, time, or circumstances surrounding his request that his trial counsel file an appeal. Because [Whaley] does not provide the court with any factual basis to support his contention, [Whaley] cannot meet his burden as required by *Strickland*.[2] Further, Defendant's counsel provided an affidavit wherein he presented to the court a factual summary of his representation of Defendant up to and after sentencing. (ECF No. 267-1.) In his affidavit, Defendant's counsel stated he discussed with Defendant the waiver of appeal when reviewing the final written plea agreement and after sentencing, and he did not see any meritorious issue from which to appeal from concerning sentencing. (*Id.* at 3.) Therefore, Defendant has failed to meet his burden on this issue.

(*Id.* at 8.) As to Whaley's other ineffective assistance of counsel claims, the court similarly found Whaley was unable to meet his burden under *Strickland* and denied Whaley a certificate of appealability. (*Id.* at 8–9.)

Whaley appealed the court's order to the Fourth Circuit. (ECF No. 287.) On August 6, 2018, the Fourth Circuit found that

> [i]n the proceedings below, Whaley filed an affidavit stating unequivocally that he informed his counsel at sentencing that Whaley wished to file a direct appeal, but that counsel failed to file one. Nothing in the district court record specifically rebuts this allegation. Because the success of this ineffective assistance claim ultimately hinges on a credibility determination, an evidentiary hearing was required, *see* [*United States v.*]*Witherspoon*, 231 F.3d [923,] 925-27 [(4th. Cir. 2000)], and the district court abused its discretion by not holding one. Accordingly, as to this claim, we vacate and remand with instructions to grant Whaley a hearing on his claim that counsel failed to appeal the criminal judgment as directed.

---

[2] Under *Strickland v. Washington*, to prevail on an ineffective assistance of counsel claim, the defendant bears the burden of showing that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." 466 U.S. 668, 687 (1984).

3

(ECF No. 292 at 3.) As to Whaley's other claims of ineffective assistance of counsel, the Fourth Circuit denied Whaley a certificate of appealability and dismissed those claims. (*Id.* at 4.)

On March 5, 2019, the court held an evidentiary hearing on whether Bloom failed to appeal the criminal judgment as directed. (ECF No. 300.) At the hearing, both Whaley and Bloom testified. Whaley testified that it took some time for him to get to a point where he wanted to plead guilty and that based on his discussions with Bloom, he thought he was going to receive a fifteen-year sentence. (ECF No. 302 at 11:19–21, 12:11–14.) Whaley further testified that he had problems with (and did not at all like) his sentence of two hundred sixty-two (262) months because prior to that, "the most time [he] ever spent in jail was three [(3)] days." (*Id.* at 14:17–22, 15:1–7.) Because Whaley thought he had received too much time, he testified that he "wanted to challenge . . . the time itself, because I knew that I shouldn't have been . . . looking at that much time." (*Id.* at 15:8–19.)

Whaley also testified that he did not recall many things. For example, he did not recall his Presentence Report ("PSR") classifying him as a career offender and said that phrase did not "sound too familiar."[3] (*Id.* at 13:21–24.) And although Whaley recalled some of what transpired during his plea colloquy,[4] he testified that he did not recall some of the discussion about his status as a career offender, even when confronted with the transcript of his plea colloquy by the Government. (*Id.* at 29:21–25, 30–32:1–24.) He also did not recall the PSR recommending a sentencing guideline range that started at two hundred sixty-two (262) months. (*Id.* at 14:1–5.) However, on cross-examination, the Government confronted Whaley with a letter from Bloom

---

[3] On redirect examination, Whaley testified that prior to being in federal court, he had not heard the term "career offender" and did not know what it meant. (ECF No. 302 at 46:5–24.)
[4] For example, Whaley recalled the Government going over the evidence against him. (ECF No. 302 at 36:21–25; 37:1–13.)

stating that Whaley was "classified as a [C]areer [O]ffender [and] the [PSR] places you in an advisory guideline range of 262 to 327 months." (*Id.* at 28:21–25, 29:1–5.) Whaley testified that he did not remember receiving this letter. (*Id.* at 29:1–5.) According to Whaley, Bloom discussed with him the possibility of a two hundred sixty-two (262) month sentence for the first time after the court stated this possible sentence at his change of plea hearing. (*Id.* at 39:5–11, 42:4–7.) But, Whaley maintained that even after the court mentioned the possibility of a two hundred sixty-two (262) month sentence, Bloom told Whaley he could plead to fifteen (15) years. (*Id.*) On redirect, Whaley entered into evidence two letters from Bloom to Whaley regarding the possibility of a fifteen-year (or less) sentence. In the first, dated October 31, 2013, Bloom wrote,

> [a]s I also stated during our [October 31 meeting], [Whaley] can earn a lesser sentence than [two hundred sixty-two (262) months] – and under the guidelines, the sentence would likely be in the 'teens (we discussed examples of 12-15 years during our meeting) – in two ways: [1] For "acceptance of responsibility" you can earn a 3-level downward departure under the advisory sentencing guidelines; and [2] If you decide to be interviewed . . . then you may be eligible for a 5K1 downward departure motion by the Government.

(ECF No. 302 at 50:7–22; ECF No. 303 at 3.) In the second letter from Bloom to Whaley, dated December 3, 2013—a little over one month before Whaley pled guilty—Bloom wrote:

> To make sure I have communicated clearly, under the plea offer the sentence starts, again under the Guidelines around 21 years but then drops to around 15 years with "acceptance of responsibility." You have a potential for a further downward departure from the prosecution, through a Rule 35 or 5K1 motion, to under 12 years.

(ECF No. 302 at 51:18–25, 52:1–18; ECF No. 303 at 6.)

Whaley also testified that he did not recall his plea agreement including an appeal waiver, though he did state that both Bloom and the court went over his plea agreement with him. (*Id.* at 15:20–21, 16:7–16.) But, on cross-examination, Whaley testified he did not remember Bloom going over the plea agreement with him. (*Id.* at 29:14–25.) Whaley further testified that he still would have wanted to challenge his sentence despite any appeal waiver. (*Id.* at 16:11–19.)

As to his discussions with Bloom about wanting to appeal his sentence, Whaley testified that after the court pronounced his sentence, he told Bloom "this can't be true, [he] kn[e]w this c[ould]n't be right. . . . [and] [he] . . . fe[lt] it was too much time." (*Id.* at 17:3–8.) Whaley also testified about whether he asked Bloom to appeal:

> Q. . . . . Did you tell him you wanted to appeal?
> A. Yes, I did.
> Q. Did you tell him you wanted to appeal on more than one occasion?
> A. Yes, sir.
> Q. Where and when did you tell Mr. Bloom that you wanted to appeal?
> A. He came back to the county.
> Q. Okay. When was that?
> A. That was Lexington County probably like I think it was the next -- that next day.
> . . . .
> Q. Who else was [in the room]?
> A. It was just me and [Bloom].
> . . . .
> Q. During that meeting in the days after your sentencing, did Mr. Bloom tell you . . . Whaley you understand you've got a right to appeal your sentence? Did he tell you that?
> A. Yes, sir.
> Q. Did he tell you that you've got to file a notice of appeal within 14 days of receiving the sentence?
> A. Yes, sir.
> Q. Did he tell you that if you tell me to file a notice of appeal, I will file it on your behalf.
> A. Yes, sir.
> Q. Okay. Did he tell you you've got an appellate waiver in your plea agreement?
> A. No sir.
> Q. He didn't tell you that?
> A. No.
> Q. Did he tell you that even though you've got an appellate waiver, if you tell me to file an appeal, I will still file an appeal on your behalf?
> A. Yes, sir.
> Q. He told you that?
> A. He didn't tell me like -- he told me he was going to do it. He told me that he was going to do the -- he was going to put me for direct appeal.
> Q. Okay. So did you tell him, I want to file an appeal?
> A. Yes, sir.
> Q. Okay. And in response, he said I'm going to file an appeal on your behalf.
> A. Yes, sir.

| | | |
|---|---|---|
| Q. | | Did you talk with him about what appellate issues you might have had? |
| A. | | I don't recall. |
| Q. | | Okay. And I guess let me rephrase it. Did you talk to him about what specific challenges you might have wanted to make? |
| A. | | Yes, I told him I wanted to challenge the time. |
| Q. | | So other than just saying, listen, I want to challenge this sentence, that's what I want to challenge, was there anything else that you said? |
| A. | | I don't remember. |
| Q. | | You don't remember? |
| A. | | No, sir. it was so long ago.[5] |

(*Id.* at 17:9–25, 18–21:1–3.) Whaley testified that about a month after he had been sentenced, because he had not heard anything about his appeal, he asked a woman he knew to call Bloom on his behalf. (*Id.* at 23:9–19.) This woman reported back to Whaley that Bloom said he was no longer Whaley's lawyer, which gave Whaley the impression Bloom had not filed an appeal on Whaley's behalf. (*Id.* at 23:21–25, 24:1–25.) Whaley testified that had Bloom told Whaley that Bloom was not going to file an appeal on his behalf, Whaley would have filed an appeal on his own and intends to file an appeal if granted the opportunity by the court. (*Id.* at 25:1–4, 26:9–12.) According to Whaley, he discussed with Bloom wanting to appeal his case in the event of a conviction throughout the process. (*Id.* at 25:11–18, 24–25, 26:1.) However, Whaley testified Bloom told him he did not believe there were any meritorious issues to appeal. (*Id.* at 25:19–23.)

During Bloom's testimony, he stated that he had practiced law for over thirty (30) years and had represented individuals charged with federal crimes for fifteen (15) years. (*Id.* at 57:24–25, 58:1–5.) Bloom testified that when he began representing Whaley,[6] he "didn't want to plead

---

[5] Several other times throughout his testimony, Whaley stated that he specifically told Bloom to file an appeal on his behalf and that Bloom said he would do so. (*See, e.g.*, ECF No. 302 at 25:5–10, 26:2–8.) Also, on cross-examination, Whaley maintained that he told Bloom he wanted to appeal "[t]he sentence itself" and that Bloom said he would file a direct appeal. (*Id.* at 43:14–25, 44:1–3, 15–22.)

[6] Bloom was Whaley's second attorney; prior to Bloom's appointment, Whaley had successfully petitioned the court to have his first counsel replaced. (*See* ECF Nos. 124, 135, 136.)

7

and he didn't want a trial, so it was somewhat of a unique position from his perspective." (*Id.* at 59:17–25, 60:1.) Bloom further explained that

> [Whaley] was dissatisfied with the large amount of time he was looking at in federal court due to his prior [state] drug convictions. He had never been through the federal system and as many of us who do this understand from both sides of the aisle, it is sometimes difficult to communicate effectively to a defendant whose never been through the federal court process before.

(*Id.* at 60:4–10.) On direct examination, Whaley began by asking Bloom about the letters Whaley previously entered into evidence. But before addressing the substance of those letters, Bloom explained why the letters were unsigned:

> Q.  . . . is it correct that as I understand that your hard file of the correspondence exchanged between yourself and Mr. Whaley either from you to Mr. Whaley or from Mr. Whaley to you, that the hard file has been misplaced in another file?
> A.  It is. When I turned my file over to you upon your request, there's two file folders I always keep in my files and they're just missing from this. One is all my correspondence I sent him and what he sent me, but the computer generated letters are accurate copies of that, albeit unsigned, and my personal attorney notes that I take at every meeting, and the only thing, I've been through everything in storage, and the only thing, explanation I would surmise is that those two individual file folders somehow were placed in a different defendant's file when they went to storage but these are accurate letters.

(*Id.* at 61:2–18.) In discussing the letters, Bloom affirmed that he had been in negotiations with the Government about "potentially getting [Whaley's sentence] down into the teens, both with a[n] acceptance of responsibility downward departure as well as a possible Rule 35 and 5K1." (*Id.* at 64:3–18.) In another letter that Whaley presented to Bloom, dated November 12, 2013, Bloom wrote "I also estimate that based on 'acceptance of responsibility' [Whaley] can earn a 3-level downward departure under the guidelines, moving your sentence into the 'teens." (ECF No. 303 at 4.) As to this statement, Bloom testified

> I may not have worded it as - - as tightly as I should have. In my mind, what I was trying to communicate to him is he could - - potentially could get into the teens

8

with both acceptance of responsibility and a 5K1 or Rule 35 departure, and I note in this letter, . . . that my last sentence references the 5K1 downward departure. I also note that in the middle of that paragraph I again recite that 262 months is what I continually communicated to him would be at the low end of the range if the [c]ourt accepted that based on the plea negotiation as it stood at that point in time.

(*Id.* at 66:2–12.) As to Bloom's December 3, 2013 letter stating that "under the plea offer, the sentence starts, again under the Guidelines, around 21 years but then drops to around 15 years with 'acceptance of responsibility.' [Whaley] could have a potential for a further downward departure from the prosecution, through a Rule 35 or 5K1 motion to under 12 years," (ECF No. 303 at 6), Bloom testified he disagreed that it was "reasonable for [] Whaley to believe he would have through acceptance of responsibility, received a sentence of around 15 years" and that he "may have worded that letter poorly." (ECF No. 302 at 69:21–25, 70:1.) Bloom further explained that at the time he wrote this letter, he was still engaged in plea negotiations with the Government. (*Id.* at 71:5–15.) Bloom also confirmed that throughout his representation of Whaley, he expressed that he believed he was facing too much time, which was reflected in Bloom's December 3, 2013 letter. (ECF No. 302 at 72:25, 73:1–11, 74:5–7; ECF No. 303 at 6.) According to Bloom, even after Whaley pled, he still did not believe his sentence was appropriate. (ECF No. 302 at 75:22–25, 73: 1–4.)

As to Bloom's discussion with Whaley about an appeal, Bloom testified as follows:

Q. After Mr. Whaley received the sentence of 262 months, when was the next time that you spoke with him?
A. The day after, which would be I believe April 30, 2014.[7]
Q. What did you discuss at the meeting?
A. Whether or not he wanted to appeal. That was the sole purpose of that meeting, I went the day after the sentence.
. . .
Q. . . . . What did he tell you regarding whether he wanted to appeal or not?

---

[7] Whaley was sentenced on April 30, 2014, so if Bloom went to visit Whaley at the LCDC the day after Whaley was sentenced, which both Bloom and Whaley testify Bloom did, then it would have occurred on May 1, 2014. (ECF No. 244; ECF No. 302 at 43:14–17, 76:11–13.)

9

> A. We discussed the appeal. I reviewed with him the plea agreement where he waived it. I told him I did not see any objections to the sentencing procedures. I understood he felt he had too much time, but I did not see any meritorious appellate issues. At the end of the less than 30-minute meeting, he verbally agreed, don't file an appeal. I've heard his testimony. I respectfully dissent.
> Q. Okay. Did you have him sign anything in writing?
> A. I didn't. And that's not my custom. . . . I'm not big on having clients sign waivers unless they're required by the [c]ourt. I think it undermines the attorney-client relationship and obviously as I sit here today it would be nice for me to produce that, but I just, it's not my habit for those reasons.
> . . .
> Q. Mr. Bloom, is your testimony that at that meeting following sentencing, Mr. Whaley agreed not to pursue an appeal?
> A. That is correct.

(*Id.* at 76:11–25, 77:1–18.)

Whaley asked Bloom about whether Whaley ever told Bloom that he wanted to appeal prior to sentencing. (*Id.* at 77:19–20.) Bloom testified that he did not recall any discussions to that effect but "[t]hey could have happened" and he

> do[es]n't necessarily dispute that [Whaley] [told] [him] time and again that he wanted to appeal. In my view, I may not have paid very much attention to that because there's nothing to appeal on the pretrial process, so I'm not saying his memory in incorrect in that, I just don't remember those discussions.

(*Id.* at 77:21–25, 78:1–17.) But, in a letter dated December 30, 2013, approximately two (2) weeks before Whaley pled guilty, Bloom addressed Whaley's statement during a December 17, 2013 meeting that "[Whaley] would get the case sent back on appeal." (*Id.* at 80:14–25; *see also* ECF No. 303 at 7.) Bloom testified that he agreed the December 30, 2013 letter reflects that Whaley had discussed appealing prior to sentencing, but that Bloom did not "have distinct recollections of that and I don't dispute that he may have brought that up on multiple occasions. It's obvious I reference that in [the letter] which is dated December 30, 2013." (*Id.* at 81:4–12.) Bloom further agreed that Whaley's statement that he planned on having his case "sent back on appeal" was an "unambiguous directive that [Whaley] was going to appeal." (*Id.* at 81:13–22.) However, Bloom

10

stated he "remembered meeting with [Whaley] very distinctly the day after sentencing." (*Id.* at 77:16–17.)[8] In that regard, Bloom testified that "[i]f [Whaley] had, when I left the Lexington [County Detention Center], said, Mr. Bloom, I don't care what you say, I want an appeal, I would have filed an appeal for him. It's a one-piece page of paper."[9] (*Id.* at 80:5–8.)

On cross-examination, Bloom testified about how he prepared his affidavit in this case:

> I am distressed that I cannot find the file folder of my handwritten attorney notes, because when I prepared this affidavit, it is now clear to me from paragraph 7 that when I prepared this affidavit I had my handwritten notes with me because I state here, quote, I reviewed, and this is paragraph 7, quote, I reviewed the various plea agreements and ongoing plea discussions with Mr. Whaley on the following dates, and then I list them, end quote. The only way I would note that, I wouldn't have an independent recollection of which dates I reviewed the plea agreements. That's not in my time sheets that I'm using today. I would have had my handwritten notes to prepare this so I could have looked at the notes and said, we talked about plea discussions and plea agreements and - - and of course I did this in August 2015 and so now I am sure what has probably happened is I pulled my correspondence out from my entire Whaley file as well as my handwritten notes to prepare this plea agreement - - or excuse me, to prepare this affidavit, and those two folders went back somewhere else.

(*Id.* at 83:6–25.) The Government then asked, "is it clear that you used your actual physical file in the preparation of that affidavit," to which Bloom responded,

> Yes, and I specifically, now that I'm using this affidavit, I would have used my handwritten notes and my original file of my letter and his letters to me, because it references the dates that I reviewed with him the plea agreements and plea discussions and some of the other issues. And the only way I would know that is to look at my handwritten notes to see what I had written when I met with him.

(*Id.* at 84:2–10.) When the Government asked Bloom if he would agree that his affidavit reflected that Whaley did not ask Bloom to file a direct appeal, Bloom testified that "[Whaley] never asked

---

[8] Bloom also testified that though he and Whaley "had disagreements, they never resulted in shouting matches, he was always very respectful to me and I was always very respectful to him." (ECF No. 302 at 79:16–19.)

[9] On cross-examination, Bloom reiterated that he would have filed an appeal had Whaley asked Bloom to do so and further testified that he had never knowingly not filed an appeal for a client who had asked him to do so after being sentenced. (*Id.* at 88:6–12.)

11

me to file an appeal on his behalf. . . . let me rephrase that, I'm sorry. . . . [Whaley] and I were in verbal agreement that I was not going to file an appeal." (*Id.* at 84:11–20.)

On redirect examination, Whaley asked Bloom whether his personal notes would have included notes from his meeting with Whaley on May 1, 2014, the day after Whaley was sentenced. (*Id.* at 89:2–3.) Bloom replied that he would have made notes about that meeting. (*Id.* at 89:4–5.) Bloom also admitted that his affidavit did not include a paragraph that stated Whaley verbally agreed to waive his rights to appeal during Bloom's meeting with him on May 30, 2014. (*Id.* at 89:9–19.) Bloom further admitted that his affidavit did not include a paragraph stating that Whaley instructed Bloom not to appeal during that meeting. (*Id.* at 89:20–22.)

## II. STANDARD OF REVIEW

A prisoner in federal custody may petition the federal court that imposed their sentence to vacate, set aside, or correct their sentence. 28 U.S.C. § 2255. Pursuant to 28 U.S.C. § 2255, a prisoner may be entitled to relief upon showing: (1) a sentence was imposed in violation of the Constitution or laws of the United States; (2) a federal court was without jurisdiction to impose a sentence; (3) a sentence was in excess of the maximum authorized by law; or (4) a sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). A prisoner attacking a sentence, proceeding under § 2255, bears the burden of proving the grounds for attack by a preponderance of the evidence. *See Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958) ("Because proceeding under 28 U.S.C. § 2255 is a civil collateral attack upon the judgment of conviction, the burden of proof is upon petitioner to establish by a preponderance of evidence that he did not intelligently waive his right to assistance of counsel."). In ruling on a § 2255 motion, the court may dismiss the motion without a hearing when "it plainly appears from the motion, any attached exhibits, and the record of prior proceedings, that the moving party is not entitled to relief . . . ."

Rules Governing Section 2255 Proceedings 4(b). *See also* U.S.C. § 2255(b) ("Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing there on . . . .").

The court is required to interpret pro se documents liberally and will hold those documents to a less stringent standard than those drafted by attorneys. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed,'" and "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976))); *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). Additionally, pro se documents must be construed in a manner, "no matter how inartfully pleaded, to see whether they could provide a basis for relief." *Garrett v. Elko*, No. 95-7939, 1997 WL 457667, at *1 (4th Cir. Aug. 12, 1997).

### III. DISCUSSION

In the Fourth Circuit's Order remanding this case, the court observed that "the success of [Whaley's] ineffective assistance claim ultimately hinges on a credibility determination." (ECF No. 292 at 3.) Unfortunately,

> [t]here is no law on judging credibility. Judges and jurors receive guidelines and elementary observations in the form of stock instructions but are essentially free to decide for themselves. Because the entire trial process rests on persuasion, determining credibility is more than evaluating testimony. Although it is customary to speak of the credibility of witnesses and the persuasiveness of counsel, both deal with the same thing: the degree of belief we attach to what we see and hear.
>
> A few brave souls have attempted to parse the elements of credibility, but this essential function is left largely to the mysteries of intuition. Although demeanor evidence can mislead, it is considered a reliable basis for finding credibility. Does the witness hesitate or stammer or show fear in answering questions? Reliance on demeanor vests wide discretion in the fact-finder. As Judge Jerome Frank,[10] no slouch when it came to pushing the judicial envelope, observed, the methods of

---

[10] Judge Jerome Frank served as a United States Circuit Judge on the United States Court of Appeals for the Second Circuit from March 27, 1941, until his death on January 13, 1957.

13

> evaluating oral testimony "do not lend themselves to formulations in terms of rules and are thus, inescapably, 'un-ruly.'"

John L. Kane, *Judging Credibility*, 33 No. 3 LITIG 31, 31 (2007). Given the "un-ruly" nature of making credibility determinations, it is "peculiarly the province of the [district court], who saw and heard the witnesses," to make such determinations. *Safeway Trails v. Allentown & Reading Transit Co.*, 185 F.2d 918, 920 (4th Cir. 1950).

On March 5, 2019, the court saw and heard both Whaley and Bloom testify about whether Whaley instructed Bloom to file an appeal on his behalf. (ECF No. 300.) At the outset, the court recognizes that the events and conversations at issue occurred in April and May of 2014, over five (5) years ago. Thus, it is no surprise that both Whaley and Bloom do not recall certain details of their interaction. Whaley's testimony indicates he recalls less than Bloom, and Whaley was inconsistent on what he did recall. For example, Whaley testified both that Bloom did not discuss with him the possibility of a two hundred sixty-two (262) month sentence, and that after the court informed Whaley he was facing a possible a two hundred sixty-two (262) month sentence at Whaley's change of plea hearing, Bloom then discussed with him the possibility of a two hundred sixty-two (262) month sentence. (ECF No. 302 at 14:1–5, 39:5–11, 42:4–7.) Whaley's testimony that Bloom did not discuss this sentence with him is belied by letters Bloom sent to Whaley, which memorialized their conversations about the possibility of a two hundred sixty-two (262) month sentence. (ECF No. 303 at 3, 4, 8.) But, part of Whaley's testimony was also confirmed by letters from Bloom. Whaley testified that he believed he was going to receive a fifteen-year sentence based on conversations with Bloom. (*See, e.g.*, ECF No. 303 at 12:11–14, 39:5–11; 41:4–7.) On at least two separate occasions, Bloom wrote to Whaley that he could receive a fifteen to twelve-year sentence if he accepted responsibility and/or agreed to be interviewed by the Government. (ECF No. 303 at 3, 6.)

Bloom did not recall Whaley ever expressing a desire to appeal in the event of an adverse outcome, though he did not dispute Whaley could have done so.[11] (ECF No. 302 at 77:19–25, 78:1–17.) However, Bloom's testimony is belied by a letter he sent to Whaley, on December 30, 2013—a few weeks before Whaley was sentenced—again memorializing a conversation in which Whaley told Bloom he "would get the case sent back on appeal." (ECF No. 303 at 7.) At the evidentiary hearing, Bloom agreed that this was an "unambiguous directive that [Whaley] was going to appeal." (ECF No. 302 at 81:13–22.)

While this testimony does not answer the dispositive question in this case, it illuminates the difficulty of the credibility determination facing the court. The testimony on the dispositive question of this case, at first glance, appears to be a classic case of he-said, he-said. Whaley maintains that on the day after he was sentenced, when Bloom came to visit Whaley at the LCDC, he directed Bloom to file an appeal on his behalf and Bloom agreed to do so. (*See, e.g.*, at 17:9–21, 18–21:1–3, 25:5–10, 26:2–8.) However, Bloom maintains that on the day after Whaley was sentenced, when Bloom went to visit Whaley at the LCDC, they agreed to not file an appeal. (*See, e.g.*, at 76:22–25; 77:1–2, 77:15–18.) What tips the preponderance scale in Whaley's favor, and moves this case beyond Whaley's words versus Bloom's, is Bloom's affidavit and his testimony about how he prepared that affidavit.

In response to Whaley's § 2255 Motion, the Government filed an affidavit by Bloom. (ECF No. 267-1.) Bloom's affidavit does not address whether or not Whaley told Bloom to file an appeal and also does not state that Whaley agreed not to file an appeal. (*See id.*) These omissions are

---

[11] Bloom testified that he "may not have paid very much attention" to Whaley expressing he wanted to appeal prior to sentencing "because there's nothing to appeal on the pretrial process, so I'm not saying his memory is incorrect in that, I just don't remember those discussions." (ECF No. 302 at 78:11–15.)

particularly telling for two reasons. First, Bloom's affidavit was made in response to Whaley's § 2255 Motion. In that Motion, Whaley specifically asserts that he told Bloom to file an appeal and that Bloom agreed to do so, but never did. (ECF No. 252-1 at 3, 5–6.) Thus, Bloom had to be aware of Whaley's allegation when he prepared his affidavit, as Whaley's § 2255 Motion was the impetus for the affidavit. Therefore, the silence of Bloom's affidavit as to whether Whaley instructed him to file an appeal is curious at best.

Second, at the evidentiary hearing, Bloom testified that it was "clear" to him that he prepared his affidavit using his handwritten notes. (ECF No. 302 at 82: 2–10.) Bloom also testified that he would have made notes about his meeting with Whaley at the LCDC on May 1, 2014, the day after Whaley was sentenced, during which both Bloom and Whaley testified they discussed an appeal. (*Id.* at 89:2–5.) However, even though Bloom testified that he "had [his] handwritten notes with [him]" when he prepared his affidavit, his affidavit does not answer whether Whaley instructed him to file an appeal. (*Id.* at 83:8–10.) What is more, Bloom's affidavit also does not reflect his evidentiary hearing testimony that Whaley agreed with Bloom not to file an appeal. (*See* ECF No. 267-1.) Bloom's affidavit states only that he went to the LCDC the day after Whaley was sentenced and discussed the appellate waiver in Whaley's plea deal. (*Id.* at 3 ¶ 9.) At the evidentiary hearing, Bloom could not explain why his affidavit was silent as to whether Whaley instructed him to file an appeal and whether Whaley agreed not to file an appeal. (ECF No. 302 at 89:9–22.) But, only a few explanations are possible. If Bloom in fact used his notes to prepare his affidavit, than this silence suggests that Bloom's handwritten notes did not state either that Whaley directed Bloom to file an appeal or that Whaley agreed not to file an appeal. Bloom simply, and innocuously, may have just failed to notate this part of his discussion with Whaley, though, again, that seems curious given that he must have notated that he discussed Whaley's

16

sentence and the appellate waiver in Whaley's plea agreement. (ECF No. 267-1 at 3 ¶ 9.) Why would Bloom make a note about discussing the appellate waiver with Whaley but not note that Whaley agreed to not file an appeal? While there are other possible nefarious explanations for why Bloom's affidavit does not speak to the dispositive question despite using his handwritten notes to prepare the affidavit, nothing in the record leads the court to believe Bloom would engage in such a manner. And the court is only bound by a preponderance of the evidence standard of review, meaning it can decide this case without determining what Bloom's handwritten notes actually showed.

In the end, Bloom's own documents, his letters and affidavit, are what tip the scale of preponderance in Whaley's favor. Bloom's letters to Whaley confirmed Whaley's testimony that Bloom told him he could receive a fifteen-year sentence and that he told Bloom he wanted to appeal before he was sentenced, lending credibility to Whaley's testimony.[12] Whaley's evidentiary hearing testimony was also consistent with what he alleged in his § 2255 Motion. *See generally United States v. Fuentes*, No. 7:11CR00046, 2014 WL 1159658, at *5 (W.D. Va. Mar. 20, 2014) (adopting the magistrate judge's finding that the petitioner did not specifically instruct his attorney to file a notice of appeal in part because the petitioner "offered a completely different version of events at the evidentiary hearing"). But, Bloom's evidentiary hearing testimony, although not technically inconsistent with his affidavit, did provide new information that was not included in Bloom's affidavit. Although Bloom testified that he used his notes to prepare his affidavit, it does not speak to whether Whaley directed Bloom to file an appeal or whether Whaley

---

[12] Bloom's letters also confirmed that Bloom communicated with Whaley about his career offender status and possible two hundred sixty-two (262) month sentence, which Whaley did not testify consistently about at the evidentiary hearing. (*See* ECF No. 303 at 3, 4, 8.) But, some inconsistencies, especially given the five (5) years between when Whaley was sentenced and the evidentiary hearing, do not render Whaley's testimony not credible.

agreed with Bloom not to file an appeal, even though it does reflect other aspects of their discussion. Given Bloom's testimony that he used his handwritten notes to prepare his affidavit, this silence says it all. Accordingly, based on a preponderance of the evidence, the court finds Whaley specifically instructed Bloom to file a notice of appeal.

Because Bloom's failure to file a notice of appeal "'depriv[ed] [Whaley] of an appeal that he otherwise would have taken, [Whaley] has made out a successful ineffective assistance of counsel claim entitling him to an appeal,' with no need for a 'further showing' of his claims' merit, regardless of whether [Whaley] has signed an appeal waiver." *Garza v. Idaho*, 139 S. Ct. 738, 747 (2019) (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 484 (2000)). Therefore, the court will vacate the original judgment against Whaley and enter a new judgment from which he can appeal. *See United States v. Peak*, 992 F.2d 39, 42 (4th Cir. 1993) ("[W]e . . . hold that a criminal defense attorney's failure to file a notice of appeal when requested by his client deprives the defendant of his Sixth Amendment right to the assistance of counsel, notwithstanding that the lost appeal may not have had a reasonable probability of success. The judgment is reversed, and the case is remanded with instructions to vacate Peak's judgment of conviction and enter a new judgment from which an appeal can be taken.").

## IV. CONCLUSION

The court **GRANTS** Whaley's § 2255 Motion to Vacate (ECF No. 252), **VACATES** its original Judgment (ECF No. 244), and directs the Clerk of Court to prepare an amended Judgment with the same sentence and conditions as indicated in the original Judgment. Whaley shall remain in the custody of the United States Attorney General and the Bureau of Prisons pending the entry of the amended Judgment, which Whaley may appeal, as explained in this Order.

**IT IS SO ORDERED.**

*J. Michelle Childs*  
United States District Judge

July 22, 2019  
Columbia, South Carolina